UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| THE HOUSING AUTHORITY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; *et al.*, <br><br> Defendants. | 3:08-CV-0626-LRH-VPC <br><br> ORDER |

Before the court is plaintiff the Te-Moak Tribe of Western Shoshone Indians of Nevada Housing Authority's ("Te-Moak Housing Authority") motion for summary judgment. Doc. #18.[1] Defendants the United States Department of Housing and Urban Development ("HUD"); Steve Preston, the Secretary of Housing and Urban Development; Paula Blunt, General Deputy Assistant for Public and Indian Housing; and Deborah Lalancette, Director of the Office of Grants Management for the Office of Native American Programs (collectively "defendants") filed an opposition (Doc. #21) and cross-motion for summary judgment (Doc. #22).

///

///

---

[1] Refers to the court's docketing number.

I.     **Facts and Procedural History**[2]

Plaintiff Te-Moak Housing Authority is the Tribally Designated Housing Entity ("TDHE")[3] for the Te-Moak Tribe of Western Shoshone Indians, a federally recognized Indian tribe located in Nevada. The Te-Moak Housing Authority operates two major housing programs: a low rent housing program and a mutual help home ownership program. On November 26, 2008, the Te-Moak Housing Authority filed the underlying declaratory and injunctive relief action alleging that defendants promulgated funding regulations which violated the Native American Housing Assistance and Self-Determination Act ("NAHASDA"), 25 U.S.C. § 4101 *et seq*.

**A. NAHASDA**

This action concerns HUD's administration and implementation of NAHASDA, a federal statute enacted to provide funding to Indian tribes in order to "help [] tribes and their members . . . improve their housing conditions and socioeconomic status." 25 U.S.C. § 4101(5).

Prior to the enactment of NAHASDA, Indian housing assistance was administered under the United States Housing Act of 1937 ("1937 Housing Act"), 42 U.S.C. § 1437 *et seq*. That act created several programs designed to help alleviate tribal housing needs. Some programs helped Indian families afford low-income rental options, while other programs allowed families to purchase housing through lease-to-own or lease-purchase agreements. One lease-to-own program in particular, the Mutual Help Program, allowed an eligible Indian family to contribute land, materials, equipment, or work to the construction of a home in return for favorable lease terms pursuant to a Mutual Help and Occupancy Agreement ("MHOA") between the Indian family and the tribe. The MHOAs entered into under the 1937 Housing Act typically provided an option for

---

[2] This action is factually similar to one recently addressed by this court in *Walker River Paiute Tribe v. HUD*, case no. 3:08-cv-0627-LRH-VPC, and raises the same issues addressed in the court's December 15, 2015 order on summary judgment. *See* Doc. #45, case no. 3:08-cv-0627-LRH-VPC.

[3] A Tribally Designated Housing Entity is an entity specifically designated by the Indian tribe to administer the tribe's housing programs.

2

the Indian family to purchase the home at the end of a twenty-five year lease period. *See* 24 C.F.R. Part 905, Subpart E (1995).

HUD, as the administering agency under the 1937 Housing Act, provided yearly financial assistance to Indian tribes according to the terms of Annual Contribution Contracts ("ACCs"). Through these ACCs, each tribe was awarded a certain amount of yearly funding to cover the costs of tribal housing projects. 42 U.S.C. § 1437c(a)(2) (1996).

In 1996, Congress passed NAHASDA and terminated all housing assistance programs created under the 1937 Housing Act. But Congress, recognizing its continuing obligation to provide tribes with financial assistance for the continued operation and maintenance of housing constructed under the 1937 Housing Act, enacted a new system of financial assistance. *See* 25 U.S.C. §§ 4112(c)(4)(D) and 4133(b). Congress' new funding assistance program was the creation of annual Indian Housing Block Grants ("IHBG").[4] 25 U.S.C. § 4111. These grants are distributed directly to Indian tribes in accordance with housing plans prepared by the tribes and approved by HUD.[5] 25 U.S.C. § 4112. Pursuant to NAHASDA, all state and federally-recognized Indian tribes are eligible for IHBG funding. 24 C.F.R. § 1000.202; 25 U.S.C. § 4103(12). Congress' express intent in enacting the IHBG program was to "[recognize] the right of Indian self-determination and tribal self-governance by making such assistance available directly to the Indian tribes or tribally designated entities . . . ." 25 U.S.C. § 4101(7). As under the 1937 Housing Act, HUD is the administering agency under NAHASDA.

///

---

[4] Indian Housing Block Grants are formula based monetary grants designed to provide financial assistance for a range of affordable housing activities on Indian reservations and designated Indian housing areas. Eligible activities include new housing development, continued assistance to housing developed under the 1937 Housing Act, related housing services, crime prevention, and community safety.

[5] Eligible tribes must submit housing plans on an annual basis to receive IHBG funding. At the end of each year, recipient tribes must also submit an annual performance report directly to HUD reporting on the tribe's progress in meeting the goals and objectives outlined in the submitted plan.

### B. Allocation Formula

To determine the amount of annual IHBG funding each Indian tribe is entitled to receive, NAHASDA delegated to HUD the creation of a funding allocation formula. 25 U.S.C. § 4152(a). However, while Congress specifically delegated the creation of the formula to HUD, Congress also circumscribed HUD's discretion by mandating the formula be "based on factors that reflect the need of the Indian tribes . . . for assistance for affordable housing activities." 25 U.S.C. § 4152(b). Congress further mandated that the formula, along with any other necessary funding and enforcement regulations, be crafted through a negotiated rule-making process involving interested Indian tribes. 25 U.S.C. § 4116.

The negotiated rule-making committee for creation of the allocation formula included fifty-eight members; forty-eight of these members represented "geographically diverse small, medium and large Indian tribes." 62 Fed. Reg. 35,719. The rule-making committee crafted and submitted a number of factors for HUD's consideration for the final formula. HUD then crafted the allocation formula codified at 24 C.F.R. §§ 1000.304-1000.340. The final IHBG funding allocation formula includes only two components: (1) Formula Current Assisted Housing Stock ("FCAS") for each recipient tribe; and (2) a tribe's individual need. 24 C.F.R. § 1000.310.

In accordance with this funding formula, to determine the amount of IHBG funding a tribe receives in a particular fiscal year, HUD first calculates the tribe's current assisted housing stock (more commonly understood as the total number of assistance-based dwelling units owned or operated by the tribe) and multiplies that number by the national per unit subsidy. 24 C.F.R. § 1000.316. HUD then immediately earmarks funds from the IHBG appropriation budget to fund the calculated units. After calculating each tribe's FCAS, HUD subsequently measures the current "need" of all participating tribes by applying certain present weighted criteria to each tribe in order to equitably distribute any remaining IHBG appropriations. *See* 24 C.F.R. § 1000.324 (identifying seven (7) weighted factors as part of the need component). The tribe's IHBG is the resulting sum of both the tribe's FCAS calculation and determined "need."

### C. FCAS Calculation

Each year, the FCAS calculation for each Indian tribe begins with the total number of assistance-based dwelling units owned or operated by the tribe as of September 30, 1997. 24 C.F.R. § 1000.312. The dwelling units considered by HUD include all Section 8 units, low-rent units, and Mutual Help Program and Turnkey III units constructed under the 1937 Housing Act. *Id*. From this starting point, HUD then eliminates certain housing units. For example, over the years, some rent-to-own units are conveyed from a TDHE's inventory due to the terms of MHOAs between the tribe and Indian families occupying the units. Reflecting these transfers of ownership, HUD promulgated a regulation in 1998 which allows for a downward adjustment to each tribe's FCAS calculation once a unit has been conveyed to an Indian family. *See* 24 C.F.R. § 1000.318.[6] Section 1000.318 specifically provides that a dwelling unit ceases to be counted for a tribe's FCAS calculation once a tribe "no longer has the legal right to own, operate, or maintain the unit . . . whether such right is lost by conveyance, demolition, or otherwise." 24 C.F.R. § 1000.318(a). In determining the number of disqualified units, HUD relies on information provided by each Indian tribe on annual response forms.

---

[6] Section 1000.318 reads in its entirety as follows:
"§ 1000.318 When do units under Formula Current Assisted Stock cease to be counted or expire from the inventory used for the formula?
    (a) Mutual Help and Turnkey III units shall no longer be considered Formula Current Assisted Stock when the Indian tribe, TDHE [tribally designated housing entity], or IHA [Indian Housing Authority] no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise, provided that:
        (1) conveyance of each mutual help or turnkey III unit occurs as soon as practicable after a unit becomes eligible for conveyance by the terms of the MHOA [Mutual Help Occupancy Agreement]; and
        (2) the Indian tribe, TDHE, or IHA actively enforce strict compliance by the homebuyer with the terms and conditions of the MHOA, including the requirements for full and timely payment.
    (b) Rental units shall continue to be included for formula purposes as long as they continue to be operated as low income rental units by the Indian tribe, TDHE, or IHA.
    (c) Expired contract Section 8 units shall continue as rental units and be included in the formula as long as they are operated as low income rental units as included in the Indian tribe's or TDHE's Formula Response Form."

5

During the years immediately following the promulgation of Section 1000.318, HUD calculated each tribe's FCAS to include all assistance-based dwelling units owned or operated by the tribe as of September 30, 1997, and only removed units from a tribe's annual calculation if HUD received notice from the tribe that a unit had been either demolished or conveyed to an Indian family. *See, e.g.,* Audit Report, Office of Inspector General (2001), p.275-279.

**D.  The HUD Audit**

In 2001, the Office of Inspector General ("OIG") conducted a wide-scale audit of HUD's implementation of NAHASDA, with a focus on HUD's implementation of the IHBG program. In its report, OIG criticized HUD for failing to enforce strict compliance with Section 1000.318 as written. OIG asserted that IHBG funds had not been properly allocated in several previous fiscal years because the tribes' FCAS calculations included housing units that no longer qualified as current assisted stock pursuant to Section 1000.318. OIG opined that because most housing programs under the 1937 Housing Act had standardized twenty-five year lease periods, "one can reasonably expect that some of these units should be paid-off, and the [TDHEs] would no longer have the legal right to own, operate, or maintain these units." Audit Report, Office of Inspector General (2001), p.279. Rather than only disqualifying those units for which HUD had received confirmation of conveyance by the tribe, OIG opined that all dwelling units that have reached the end of their twenty-five year lease period, whether or not they were still owned by a tribe, should be disqualified and removed from a tribe's FCAS calculation pursuant to Section 1000.318.

At the conclusion of the audit, OIG further recommended that HUD regularly audit all participating tribes and recover funds from any tribe that had inflated FCAS calculations for previous years. In the years following the OIG audit report, HUD implemented these recommendations, including the strict interpretation of Section 1000.318 for subsequent FCAS calculations.

///

///

### E. Amended NAHASDA

On October 14, 2008, NAHASDA was amended by the 2008 NAHASDA Reauthorization Act ("2008 Reauthorization Act"), PL 110-411, 122 Stat. 4319 (2008). Under the 2008 amendment, NAHASDA's formula allocation provision was amended to incorporate some of the language from 24 C.F.R. § 1000.318. *See* 25 U.S.C. § 4152 (2008). Now, as part of the amended allocation formula, dwelling units that are past the twenty-five year lease period, but have not been conveyed from a TDHE's ownership, are removed from a tribe's yearly FCAS calculation unless the unit could not be conveyed to the Indian family "for reasons beyond the control of the [recipient tribe.]" 25 U.S.C. § 4152(b) (2008). The amended statute further identifies what constitutes a "reason beyond the control of the [recipient tribe.]" 25 U.S.C. § 4152(d) (2008). Thus, as now amended, HUD is authorized by statute to disqualify from a tribe's FCAS calculation those dwelling units that are more than twenty-five years old but have not yet been conveyed.

### F. This Action

Since 2002, HUD has conducted a yearly audit of the Te-Moak Housing Authority's IHBG funding. In those audits, HUD determined that the tribe had been overfunded in each fiscal year, fiscal year 2002 through fiscal year 2008, in the total amount of $769,645.00 due to an inflated FCAS calculation. HUD then requested repayment from the tribe for the overpaid funds through either repayment of unspent funding or a reduction in forthcoming funding for the next several years.

On November 28, 2008, the Te-Moak Housing Authority initiated the present action against HUD under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, seeking a determination that HUD's promulgation and interpretation of 24 C.F.R. § 1000.318 was arbitrary and capricious. Doc. #1. In its complaint, the tribe contends that the exclusion of dwelling units from the block grant formula is in violation of the specific pre-amendment statutory language of NAHASDA, particularly 25 U.S.C. § 4152 (1996). Further, the tribe alleges that HUD's recapture of funds is in violation of its due process rights because HUD did not comply with the notice and hearing

7

requirements of 25 U.S.C. §§ 4161 and 4165 (2008). In response to the complaint, both parties filed the present cross-motions for summary judgment. Doc. ##18, 22.

## II.     Legal Standard

### A.  Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute;

there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

Where, as here, parties filed cross-motions for summary judgment on the same claims before the court, the court must consider each party's motion separately and on its own merits. *Fair Hous. Council of Riverside Cnty, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). Accordingly, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them." *Id.* at 1134.

### B. Administrative Procedures Act

This action is brought pursuant to the Administrative Procedures Act. Under the APA, a reviewing court may set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124-25 (9th Cir. 2007).

Review under the arbitrary and capricious standard is narrow, and the court must not substitute its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), overruling in part on other grounds recognized by *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 949 (9th Cir. 2014). Nonetheless, the court must engage in a substantial inquiry of the agency's action. *Brong*, 492 F.3d at 1125. To meet its burden under this standard, an agency must present a "rational connection between the facts found and the conclusions made." *Id*. An agency's decision is arbitrary and capricious if it was not "based on a consideration of the relevant factors" or if there was a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

### C. Indian Canon of Statutory Construction

In its motion for summary judgment, the Te-Moak Housing Authority argues that the court must interpret NAHASDA in a manner that favors the Te-Moak Tribe of Western Shoshone Indians. *See, e.g., Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985) (in actions involving Native American tribes, "statutes are to be construed liberally in favor of Indians, with ambiguous

provisions interpreted to their benefit"). However, the court finds that this canon of statutory construction does not apply in this action. As NAHASDA allocates one total sum of annual appropriations amongst all eligible Indian tribes, an interpretation of the statute that increases funding to some tribes necessarily decreases funding to other tribes under other formula factors. In such circumstances where one statutory interpretation would favor one tribe, but would also adversely affect another tribe's interest, the Indian canon of statutory construction does not apply. *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) ("We cannot apply the canons of construction for the benefit of the [Chehalis Tribe] if such application would adversely affect Quinault interests.") (internal citations omitted).

## III.     Discussion

In its complaint, the Te-Moak Housing Authority raises three challenges to HUD's interpretation and implementation of NAHASDA, and in particular, 24 C.F.R. § 1000.318. First, it contends that NAHASDA's funding allocation provision, 25 U.S.C. § 4152 (1996), required HUD to create a funding formula that set an annual funding floor for each tribe equal to the number of assistance-based dwelling units owned and operated by the tribe on September 30, 1997. Thus, HUD's promulgation of 24 C.F.R. § 1000.318, which authorizes HUD to remove conveyed or demolished units from a tribe's FCAS calculation, was a violation of NAHASDA. Second, it contends that even if HUD was authorized by NAHASDA to promulgate a regulation allowing for the disqualification of conveyed units from a tribe's FCAS calculation, HUD's post-audit interpretation of Section 1000.318 requiring the disqualification of all units past their initial twenty-five year lease term is an arbitrary and capricious interpretation of the regulation. Finally, it contends that HUD's attempt to recapture grant funds without a hearing constitutes a violation of it's statutory due process rights as outlined in 25 U.S.C. §§ 4161 and 4165 (2008). As all of these challenges have been fully briefed by the parties in the present cross-motions for summary judgment, the court shall address each challenge below.

///

**A.  Authority to Promulgate Section 1000.318**

The first question presented to the court is whether 24 C.F.R. § 1000.318 is a valid funding allocation regulation under NAHASDA. The Te-Moak Housing Authority's position is that Congress, through NAHASDA, required HUD to create a funding formula that mandated that a tribe receive annual funding equal to the number of assistance-based dwelling units owned by a tribe on September 30, 1997. However, in contravention of Congress' intent, HUD promulgated a regulation disqualifying mutual-help units "lost by conveyance, demolition, or otherwise." *See* 24 C.F.R. § 1000.318(a). The Te-Moak Housing Authority asserts that under the specific language of 25 U.S.C. § 4152(b)(1) (1996), HUD was without authorization to create any regulation that allowed for the disqualification of units from a tribe's FCAS calculation. The court disagrees.

Under NAHASDA, HUD was required to create a funding formula to allocate annual IHBGs based on each tribe's need pursuant to 25 U.S.C. § 4152 (1996).[7] The authorizing language of Section 4152 is plain and unambiguous in that it required any funding formula be "based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." 25 U.S.C. § 4152(b) (1996). These factors include (1) the number of assistance-based dwelling units owned at the time the formula was propagated; (2) the level of poverty and economic distress affecting Indian tribes; and (3) "other objectively measurable

---

[7] The allocation formula laid out in 25 U.S.C. § 4152 (1996) states as follows:
"(a) Establishment
   The Secretary shall, by regulations issued not later than the expiration of the 12-month period beginning on October 26, 1996, in the manner provided under section 4116 of this title, establish a formula to provide for allocating amounts available for a fiscal year for block grants under this chapter among Indian tribes in accordance with the requirements of this section.
(b) Factors for determination of need
   The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:
      (1) the number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
      (2) the extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.
      (3) other objectively measurable conditions as the Secretary and the Indian tribes may specify."

11

conditions." 25 U.S.C. § 4152(b)(1)-(3) (1996).

Although Section 4152(b)(1) specifically states that the formula must be based on "the number of dwelling units owned or operated at the time" the formula was propagated, nowhere does NAHASDA require the funding of these dwelling units in perpetuity. In fact, Section 4152(b)(1) simply states that the number of dwelling units as of September 30, 1997, is just one component of a tribe's "need." The statute's use of the phrase "based on" indicates that the dwelling unit factor identified in Section 4152(b)(1) is only a starting point for HUD's formula, which may be affected by other factors.

Here, it is undisputed that HUD's funding formula begins by calculating a tribe's total number of assistance-based dwelling units owned or operated by the tribe on September 30, 1997. 24 C.F.R. §§ 1000.312 and 1000.316. As such, HUD complied with NAHASDA's mandate by including all of the dwelling units identified by Section 4152(b)(1) as the starting point for FCAS calculation. It is only after HUD has calculated this initial number that it then removes conveyed or demolished units pursuant to 24 C.F.R. § 1000.318. Although this regulation reduces the number of dwelling units from that starting number, the court finds that this reduction is authorized because Section 4152(b)(1) was but one factor required to meet the statute's overarching mandate that the formula "reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." 25 U.S.C. § 4152(b) (1996).

HUD's adjustment from the number required by Section 4152(b)(1) is not a violation of NAHASDA because the adjustment was accomplished through "other objectively measurable conditions" that reflected the need of the Indian tribes in accordance with Section 4152(b)(2)-(3). A reduction equal to the number of dwelling units no longer owned or operated by a TDHE recognizes the ongoing and evolving needs of a tribe. NAHASDA clearly mandated an interplay between all three statutory factors in the determination of a tribe's need. Section 1000.318's downward adjustment is a direct example of this interplay, and, as such, it was not an arbitrary or capricious provision. Interpreting Section 4152(b)(1) to prohibit a reduction in the number of

12

dwelling units no longer under the responsibility of a TDHE is inconsistent with the statute's plain language and is contrary to Congress' unambiguous intent that the funding formula relate to the needs of all tribes. Therefore, because NAHASDA was unambiguous and 24 C.F.R. § 1000.318 was promulgated within NAHASDA's mandate, the court finds that 24 C.F.R. § 1000.318 is a valid regulation.

The court's holding is in line with the only appellate court to have addressed this issue. In *Fort Peck Housing Authority v. HUD*, 367 Fed. Appx. 884 (10th Cir. 2010) (*"Fort Peck II"*), the Fort Peck Housing Authority, in a similar factual pattern, brought suit challenging 24 C.F.R. § 1000.318. Specifically, the housing authority argued that HUD was without authority under NAHASDA to implement any regulation that reduced the number of housing units from those owned or operated by the tribe as of September 30, 1997. In a well written decision, the Tenth Circuit disagreed and held that 25 U.S.C. § 4152(b)(1) did not create a perpetual funding floor equal to the number of dwelling units owned in September 1997. *Fort Peck II*, 367 Fed. Appx. at 891 ("An interpretation of the formula requirement in NAHASDA that requires a perpetual funding floor does not reflect Congress's unambiguous intent that the formula be related to the need of all Tribal Housing Entities."). The Tenth Circuit further held that HUD had authority under NAHASDA to promulgate Section 1000.318, and that Section 1000.318 was a valid funding regulation under NAHASDA. *Id*. at 892. Although this decision is not binding on the court, the court finds the Tenth Circuit's holding to be persuasive. Therefore, as addressed above, the court finds that HUD's promulgation of 24 C.F.R. § 1000.318 was not arbitrary and capricious. *See also Crow Tribal Hous. Auth. v. HUD*, 924 F. Supp. 2d 1217, 1223 (D. Mont. 2013) (holding that Section 1000.318 is a valid implementation of Congressional intent).

**B. HUD's Interpretation of Section 1000.318**

Having found that 24 C.F.R. § 1000.318 is a valid regulation pursuant to NAHASDA, the court must now turn to whether HUD's post-audit interpretation of the regulation - which excludes all homes past their initial twenty-five year lease period from a tribe's FCAS calculation - is an

13

arbitrary and capricious interpretation of the regulation. This issue was not addressed by the Tenth Circuit in *Fort Peck II*.

Reviewing the documents and pleadings on file in this matter, the court finds that HUD's interpretation of Section 1000.318 is arbitrary and capricious. Nothing in the regulation supports HUD's position that assistance-based dwelling units are no longer eligible for FCAS calculation simply because the original twenty-five year term has expired. Instead, Section 1000.318 speaks in terms of whether or not a tribe has the "legal right to own, operate or maintain the unit." 24 C.F.R. § 1000.318. A TDHE maintains the legal right to own, operate or maintain the unit until it is actually conveyed. Further, the legal right to own, operate, or maintain a unit is measured by the terms of the MHOA between the tribe and the Indian family. It is fundamental that the tribe have latitude in determining the need for subsidized housing among its people.

Moreover, HUD's interpretation has disregarded the fact that both the tribe and homebuyer may have certain contract rights under an MHOA, including the extension of the repayment schedule for a delinquent balance. HUD's interpretation would disqualify any unit that had its lease term extended to overcome payment delinquency despite the fact that the tribe still owns or operates the units. As such, HUD's interpretation places the Te-Moak Housing Authority in the unreasonable position of having to decide between evicting a delinquent Indian family or losing a portion of its IHBG funding if it allows the Indian family to remain in the unit. This interpretation has effectively usurped the rights of the tribe to determine how to enforce its own contracts.

Further, as this court found in *Walker River*, there are many scenarios where HUD's categorical exclusion of units past their initial twenty-five year lease period is arbitrary and capricious. As previously found by this court, "HUD's interpretation excludes units that could not be conveyed because they were undergoing federally funded repair or modernization work; excludes demolished units that were scheduled for replacement but haven't been rebuilt yet; and excludes units that were not or could not be conveyed due to title impediments." Doc. #45, p. 15, case no. 3:08-cv-0627-LRH-VPC. Therefore, based on the record before the court, the court finds

14

that HUD's interpretation of 24 C.F.R. § 1000.318 as applied to the Te-Moak Housing Authority was arbitrary and capricious.

### C. Notice and a Hearing

The Te-Moak Housing Authority's final argument is that HUD failed to comply with the notice and opportunity for hearing requirements of NAHASDA, found at 25 U.S.C. §§ 4161 and 4165 (2008), when it attempted to recapture funds previously provided to the tribe to operate its housing programs. The Te-Moak Housing Authority argues that HUD's authority to adjust a recipient's IHBG amount is subject to the specific notice and hearing requirements as laid out in Sections 4161 and 4165. As HUD has not complied with these requirements, the Te-Moak Housing Authority argues that HUD violated its statutory due process rights.

In support of its motion, the Te-Moak Housing Authority cites several district court cases for the proposition that Sections 4161 and 4165 apply to all attempts by HUD to recapture funds. *See, e.g., Lummi Tribe, et al. v. United States*, 106 Fed. Cl. 623, 632 (Fed. Claims Aug. 21, 2012) ("Because we conclude that [25 U.S.C. § 4165] applies in the instant case, we further conclude that HUD was not free to disregard the requirements of that section in favor of a common law remedy with no apparent rules or limitations."); *Crow Tribal Hous. Auth.*, 924 F. Supp. 2d at 1227 (holding that HUD violated the notice and hearing requirements of 25 U.S.C. §§ 4161 and 4165 when it unilaterally recaptured overpaid funds). However, subsequent to these district court decisions, the Ninth Circuit in *Fort Belknap Housing Department v. Office of Public and Indian Housing*, 726 F.3d 1099 (9th Cir. 2013), addressed this exact issue and held that HUD possesses the inherent authority to recoup funds paid by mistake and that HUD is not required to follow the notice and hearing requirements of Sections 4161 and 4165. 726 F.3d at 1105 ("HUD possesses the authority to recover the amounts of overpayment [the tribe] received independent of its power [under Sections 4161 and 4165].").

In *Fort Belknap*, the Fort Belknap Housing Authority brought suit challenging HUD's unilateral recapture of IHBG funds paid to the tribe. The housing authority argued that in order to

15

recapture funds, HUD must follow the statutory notice and hearing requirements outlined in 25 U.S.C. §§ 4161 and 4165. The Ninth Circuit disagreed and held that "HUD can recover the amount of over payment . . . pursuant to the doctrine of payment by mistake. [HUD] was not required to resort to [25 U.S.C. §§ 4161 and 4165] to recover those amounts, and it did not do so." *Id*. The Ninth Circuit's decision is binding on this court. As such, the court finds that HUD was not required to follow the notice and hearing requirements of 25 U.S.C. §§ 4161 and 4165 in order to recapture funds paid to the Te-Moak Housing Authority. Therefore, the court finds that because HUD had its own authority pursuant to the doctrine of payment by mistake to recoup funds paid to the Te-Moak Housing Authority, HUD did not violate the tribe's statutory due process rights by offsetting the tribe's IHBG funding or requesting repayment of funds.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (Doc. #18) is GRANTED in-part and DENIED in-part in accordance with this order.

IT IS FURTHER ORDERED that defendants' counter-motion for summary judgment (Doc. #22) is GRANTED in-part and DENIED in-part in accordance with this order.

IT IS FURTHER ORDERED that defendants' unopposed motion to supplement administrative record (Doc. #19) and unopposed motion for leave to file overlength opposition and cross motion (Doc. #20) are GRANTED.

IT IS SO ORDERED.

DATED this 13th day of January, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE